IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN M. CARZOLI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 11 C 4677 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

John M. Carzoli brought this action for review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423. The parties have filed cross-motions for summary judgment. For the reasons stated below, the court grants Carzoli's motion (dkt. 12) insofar as it seeks a remand, denies the Commissioner's motion (dkt. 20), and remands the case for further proceedings consistent with this opinion.[2]

## BACKGROUND

**I.      Employment History**

Carzoli is currently fifty-six years old and lives in Crestwood, Illinois. (Administrative Record ("AR") 146, 152.) He testified at the hearing before the Administrative Law Judge ("ALJ") that he is single and lives with his mother in her condominium. (AR 17.) Carzoli also testified that he has a twenty-four-year-old daughter. (*Id.*) Carzoli has a G.E.D. (*Id.*)

---

[1] Under Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin automatically substituted as defendant for the former Commissioner, Michael J. Astrue, when she became the Acting Commissioner of Social Security on February 14, 2013. *See* Fed. R. Civ. P. 25(d).

[2] The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).

1

From 1997 to 1998, Carzoli worked as a carpenter, where he lifted and carried lumber, ladders, and other materials six days per week. (AR 213, 215.) Later, from 2000 to 2003, Carzoli worked as a truck driver. (AR 213.) In that capacity, Carzoli hauled construction materials in his truck and lifted shovels and other equipment on a daily basis. (AR 19, 214.) Carzoli has not been employed since his alleged disability onset date of September 2, 2003. (AR 18, 213.)

## II.     Medical History

Beginning in 2005 and continuing into 2010, Carzoli received treatment for depression and bipolar disorder in the form of medication management, individual therapy, and group therapy at the Beverly Morgan Park Mental Health Center and the Roseland Neighborhood Health Center, both of which are located in Chicago, Illinois. (AR 278, 613.) Treatment notes from that time period describe Carzoli as cooperative and state that he had good or fair insight into his condition and that his speech, affect, memory, and thought content were found to be within normal limits. (*See, e.g.*, AR 278–89.) Treatment notes also mention periods of poor sleep, mood swings, depressed mood, anxiety, and difficulty with concentration, and notes from 2008 through early 2010 indicate Global Assessment of Functioning ("GAF") scores of 59 or 60.[3] (*See, e.g.*, AR 279–89, 303–05, 399, 412, 433, 435, 440, 447, 450, 503, 506, 508, 514, 516.)

In addition to the treatment notes, the medical evidence consists of reports and questionnaires completed by state-agency physicians and psychologists, Carzoli's mother, and Carzoli's treating psychiatrist. On August 18, 2005, Norma Villanueva, M.D., examined Carzoli

---

[3] "The GAF Scale is a 100-point metric used to rate overall psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness." *Czarnecki* v. *Colvin*, 595 Fed. App'x 635, 638 n.2 (7th Cir. 2015) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (4th ed. 2000) ("DSM")). Scores of 59 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM at 32.

on behalf of the Illinois Bureau of Disability Adjudication Services. (AR 269.) Dr. Villanueva noted that Carzoli had been diagnosed with asthma nine years prior and that he suffered from sudden spells of shortness of breath and coughing; that he used medication and had been seeing a psychiatrist for his depression; and that he was obese at 5'6" and 255 pounds. (AR 269, 270.) Upon examination, Dr. Villanueva found no signs of wheezing. (AR 271.) She found that Carzoli's breathing sounds were vesicular in nature and that air entry was "good." (*Id.*)

Carzoli's mother filled out a third-party function report on May 20, 2008 regarding Carzoli's functional abilities. (AR 202–09.) In that report, she noted that while Carzoli had trouble sleeping and "sometimes" needed to be reminded to take his medication, he bathed "every day" and was able to feed himself. (AR 203.) She also reported that Carzoli did not do household chores "because he won't do it" and that Carzoli's impairments affected his ability to concentrate, complete tasks, and get along with others. (AR 204, 206.) Indeed, Carzoli's mother noted that Carzoli frequently argued with family members, friends, neighbors, and others. (AR 206.)

On July 11, 2008, Matthew Castelinos, M.D., Carzoli's treating psychiatrist, completed a mental-impairment questionnaire. (AR 339–42.) Dr. Castelinos stated that he met monthly with Carzoli to provide psychiatric care, as well as individual and group therapy, and diagnosed Carzoli with manic-depressive psychosis, impulse-control disorder, and intermittent-explosive disorder. (AR 339.) Further, Dr. Castelinos noted that Carzoli's highest GAF score in the past year had been 59 and stated that Carzoli's symptoms included poor memory; sleep, mood, and appetite disturbance; substance dependence; anhedonia; psychomotor agitation or retardation; suicidal ideations or attempts; decreased energy; manic syndrome; persistent irrational fears; hostility and irritability; and generalized persistent anxiety. (*Id.*) According to Dr. Castelinos,

Carzoli's side effects from his medications included upset stomach as well as drowsiness, fatigue, and lethargy. (AR 340.) In addition, Dr. Castelinos opined that Carzoli would need medication for the rest of his life and would be unable to hold down a job for very long, as his impairments would force him to miss work more than three days per month. (*Id.*) Furthermore, Dr. Castelinos noted that Carzoli had poor to no ability to perform fourteen out of the sixteen mental abilities and aptitudes needed to do unskilled work and opined that Carzoli was markedly limited in activities of daily living; extremely limited in maintaining social functioning; and constantly experiencing deficiencies in concentration, persistence, or pace. (AR 341–42.) Finally, Dr. Castelinos noted that Carzoli had repeated (i.e., more than three) episodes of deterioration or decompensation in work or work-like settings.[4] (AR 342.)

Joelle J. Larsen, a state-agency psychologist, concluded on July 14, 2008 that Carzoli's mental impairments were not severe and that they caused only mild limitations in activities of daily living and social functioning and mild difficulties in maintaining concentration, persistence, or pace. (AR 344, 354.) On July 25, 2008, George Andrews, M.D., another state-agency medical consultant, determined that Carzoli was capable of performing medium work as defined in the Commissioner's regulations, provided that he avoided concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (AR 359–65.)

On April 25, 2009, Terry Travis, M.D., a state-agency psychiatrist, reviewed Carzoli's medical records. (AR 525–27.) Dr. Travis noted that mental status examinations contained in the record were often "within normal limits" and that the medical records indicated that Carzoli had a history of asthma and obesity. (AR 527.) Finally, on July 22, 2009, David L. Biscardi, a psychologist, completed a medical interrogatory regarding Carzoli's mental functioning in

---

[4] In the section of the questionnaire prompting Dr. Castelinos to provide clinical findings, including the results of his mental status examination, Dr. Castelinos wrote, "Please see Attachment p. 2 & 3." (AR 340.) The attachment, however, does not appear in the record.

4

response to a request from the Social Security Administration's Office of Disability Adjudication and Review. (AR 529, 533.) Dr. Biscardi concluded that the treatment record was insufficient to assess the severity of Carzoli's alleged mental impairments and that the evidence was "conflictual regarding severity." (AR 538.)

### III. Disability Claim and Hearing Testimony

Carzoli filed an application for DIB on April 29, 2008, alleging a disability onset date of September 2, 2003. (AR 74.) Carzoli's date last insured for DIB was December 31, 2007. (*Id.*) The Social Security Administration denied his claim initially on August 4, 2008 and upon reconsideration on April 24, 2009. (*Id.*) Carzoli requested a hearing before an ALJ on April 30, 2009, and ALJ Sylke Merchan held a hearing on March 11, 2010. (*Id.*) At the hearing, Carzoli testified on his own behalf. (*Id.*) Julie Bose, a vocational expert, also testified at the hearing. (AR 74.)

#### A. Carzoli's Testimony

Carzoli testified that he has not worked since leaving his job as a truck driver in 2003. (AR 18–19.) According to Carzoli, he quit his job because he would get "annoyed by the traffic" and would "start beeping at people, screaming, ranting and raving" while driving his truck. (AR 20.) Further, Carzoli testified that his poor relationship with his co-workers led him to quit. (AR 21.) Indeed, Carzoli explained that he "believe[d] everybody was talking about [him], and they were making fun of [him]," leading to verbal altercations. (AR 20–21.)

Carzoli testified that he was first diagnosed with asthma approximately twelve to fourteen years ago and that he uses an inhaler and prescription medication to manage his symptoms. (AR 25.) With respect to his depression and bipolar disorder, Carzoli stated that he participates in group therapy a few times a month and visits his psychiatrist once every three months. (AR 29.)

5

He also takes Abilify, Prozac, and Seroquel to manage his mental impairments. (*Id.*) According to Carzoli, his depression and bipolar disorder deprive him of any motivation and make him "want to lay in bed." (AR 30.) Carzoli also testified that his depression prevents him from sleeping at night and that his Seroquel makes his feet and right hand ache. (AR 30–32.) Although Carzoli acknowledged that he had previously smoked marijuana and experimented with cocaine, he testified that now, he merely drinks beer. (AR 33–36.)

With regard to his daily activities, Carzoli testified that his mother does all of the cooking, cleaning, laundry, and grocery shopping. (AR 36.) According to Carzoli, he often does not leave the condominium "for days" and merely watches television and stays in his room. (AR 37.) Carzoli also testified that oftentimes, he "[does not] want to even take a bath" and instead just wants "to lay in bed and [does not] want to be bothered." (AR 30.) When the ALJ asked him how long he can stand at one time, Carzoli responded that he can only do so for five minutes, as after a longer period of time, his back begins to hurt due to his obesity. (AR 38.) Similarly, Carzoli testified that he can only walk "a block or two" and sit for half an hour at one time. (AR 38–39.) When asked how much he can lift, however, Carzoli responded that he can lift 100 pounds. (AR 39.) Carzoli also testified that he struggles to remember names, addresses, and telephone numbers, as well the dates of his medical appointments. (AR 41.)

In response to questioning by his attorney, Carzoli testified that his depression and feelings of loneliness sometimes push him to drink alcohol. (AR 42.) Further, Carzoli testified that he struggles to interact with groups of individuals, as he believes that they are laughing at him or talking about him. (AR 43.) Moreover, Carzoli testified that he is "very unhappy the way I am," largely due to his lack of sleep, inability to get along with others, and lack of friends. (*Id.*)

6

### B. The Vocational Expert's Testimony

The vocational expert, Julie Bose, answered a number of hypothetical questions about Carzoli's ability to work. The ALJ first asked Bose whether a hypothetical claimant could perform Carzoli's past relevant work if the claimant had Carzoli's age, education, and work experience; could work at the medium exertional level; and had to avoid concentrated exposure to all environmental irritants. (AR 48.) Bose responded that the hypothetical claimant would not be able to perform Carzoli's past relevant work but would be able to work as a store laborer, a laundry worker, or a drill-press operator. (*Id.*) When asked if it would make a difference if the claimant were limited to simple, routine, and repetitive tasks; only occasional job-related decision making; and only occasional interaction with co-workers, supervisors, and the public, Bose responded that such limitations would eliminate the claimant's ability to perform the drill-press-operator job but would not impact the other two positions. (AR 49–50.) Moreover, such a claimant would be able to work as an order puller. (AR 50.)

The ALJ then asked whether Bose's analysis would change if the hypothetical claimant could only work in a low-stress job with a relaxed or flexible production requirement. (AR 51.) Bose responded that such a limitation would eliminate the order-puller job but would not impact the laundry-worker or store-laborer positions. (*Id.*) When the ALJ inquired as to whether the hypothetical claimant's need to miss work three or more days per month would alter Bose's analysis, Bose responded that the additional limitation would render the claimant unable to work. (AR 52.)

Finally, Carzoli's attorney questioned Bose as to whether additional limitations would preclude the hypothetical claimant from finding employment in the national economy. (AR 52–53.) Specifically, Carzoli's attorney asked whether the hypothetical claimant would be able to

7

work if his impairments required him to be off-task more than 15% of the workday or prevented him from having contact with his co-workers or the public. (AR 53.) Bose testified that under either scenario, the hypothetical claimant would be unable to work. (*Id.*)

### C. Denial of Claim

The ALJ issued an opinion denying Carzoli's claim for benefits on July 2, 2010. (AR 74–85.) Carzoli requested review of the ALJ's decision, which the Appeals Council denied on June 17, 2011, making the ALJ's decision the final decision of the Commissioner. (AR 1–3.)

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner of Social Security "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097–98 (7th Cir. 2013) (citing 42 U.S.C. § 405(g); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. of N.Y., Inc.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [the court] must uphold the decision under review." *Shideler* v. *Astrue*, 688 F. 3d 306, 310 (7th Cir. 2012). The ALJ's decision, however, must rest on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, the ALJ must "build a logical bridge from the evidence to his conclusion." *Shideler*, 688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent

meaningful review,' a remand is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## ANALYSIS

### I. Legal framework

To determine whether a claimant is disabled and thus eligible for DIB, an ALJ uses a five-step inquiry. *See* 20 C.F.R. § 404.1520; *Kastner*, 697 F.3d at 646. First, the ALJ determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ assesses whether the claimant has an impairment or combination of impairments that is severe. *See id.* § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the impairments meet or equal a listed impairment in the Social Security regulations and thus preclude the performance of substantial gainful activity. *See id.* § 404.1520(a)(4)(iii). At step four, the ALJ analyzes the claimant's residual functional capacity ("RFC") to determine whether the claimant can perform his past relevant work. *See id.* § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform other work in the national economy considering the claimant's RFC, age, education, and experience. *See id.* § 404.1520(a)(4)(v). "The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step." *Young* v. *Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

### II. The ALJ's Decision

The ALJ found that Carzoli had not engaged in substantial gainful activity from his alleged disability onset date of September 2, 2003 through his date last insured of December 31,

9

2007.  (AR 76.)  The ALJ also found that the medical evidence established that Carzoli suffered from four severe impairments:  depression, bipolar disorder, obesity, and asthma.  (*Id.*)  At step three, the ALJ determined that no treating or examining physician indicated findings that would satisfy the severity requirements of any listed impairment.  (*Id.*)  In doing so, the ALJ explained that Carzoli did not meet the requirements of the listings for asthma or affective disorders.  (AR 76–77.)

The ALJ then determined Carzoli's RFC and found that Carzoli could perform medium work as defined in the federal regulations, with the exception that Carzoli could perform only simple, routine, and repetitive tasks; could make only occasional job-related decisions; and could have only occasional interaction with co-workers, supervisors, and the public.  (AR 78.)  The ALJ also determined that Carzoli would need to work in an environment involving few, if any, workplace changes; should avoid concentrated exposure to environmental irritants; and should have relaxed or flexible production requirements.  (*Id.*)

In arriving at this conclusion, the ALJ found that the evidence in the record did not support Carzoli's statements concerning the intensity, persistence, and limiting effects of his impairments.  (AR 82.)  Indeed, the ALJ reasoned, mental status examinations during the alleged disability period were within normal limits, GAF scores after the date last insured were consistently at 60, and Carzoli's testimony that he could not take care of his personal needs was inconsistent with his mother's statement that he bathes every day.  (*Id.*)  The ALJ noted that Carzoli's RFC was consistent with Dr. Andrews's assessment but gave less weight to Dr. Larsen's opinion that Carzoli's mental impairments were not severe because "the longitudinal evidence shows that the claimant's alleged mental impairments are severe and . . . would cause significant limitations in the claimant's ability to perform basic mental work activities."  (AR

10

82–83.) The ALJ also gave little weight to Dr. Biscardi's opinion that the medical evidence was insufficient to assess the severity of Carzoli's mental impairments, given the "voluminous mental health treatment records for the relevant time period." (AR 83.) Moreover, the ALJ gave little weight to the opinion of Dr. Castelinos, finding that his assessment of Carzoli's functioning was inconsistent with the GAF scores of 59 and 60 and the "stable" mental status evaluations contained in the record. (*Id.*)

In light of his RFC assessment, the ALJ concluded at step four that Carzoli could not perform his past relevant work as a truck driver or carpentry helper. (*Id.*) At step five, however, the ALJ found that Carzoli could perform other jobs in the national economy, including that of a store laborer and laundry worker. (AR 84.)

### III.     Whether the ALJ Properly Evaluated the Opinion of Dr. Castelinos

Carzoli first argues that the ALJ erred in assigning little weight to Dr. Castelinos's opinion. Because a treating physician is often in the best position to provide a detailed assessment of a claimant's condition, a treater's opinion must be given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *see Larson* v. *Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). An ALJ who does not give a treating physician's opinion controlling weight must give "good reasons" for declining to do so. 20 C.F.R. § 404.1527(c)(2); *Campbell* v. *Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Here, the reasons the ALJ gave for discounting Dr. Castelinos's opinion do not meet this standard. In assigning little weight to Dr. Castelinos's assessment, the ALJ explained that it was "inconsistent with treatment records which show consistent GAF scores of 59–60 as well as stable mental status examinations over many years." (AR 83.) In doing so, however, the ALJ

11

failed to account for Carzoli's treatment notes as a whole, which, aside from the mental status evaluations and GAF scores, support Dr. Castelinos's assessment by showing that Carzoli had ups and downs over an extended period of time. Indeed, in May and June of 2005, Carzoli reported that he was not sleeping well and that he was averaging only four to five hours of sleep per night, even though his judgment was intact and his speech, affect, mood, and thought content were within normal limits. (AR 278–79.) In July, Carzoli had fair insight into his condition but continued to have problems sleeping; he also reported being argumentative with others and had decreased energy and anhedonia. (AR 280.) Carzoli's inability to sleep continued through December 2005 (when Carzoli appeared "disheveled" despite having fair insight into his condition) and persisted into June of 2006 (when Carzoli reported feelings of worthlessness and had "road rage towards himself"). (AR 282, 283–87.) And although treatment notes from 2007 are largely illegible (AR 316–21), notes from 2008 indicate that while Carzoli's mood was within normal limits, he struggled with his attention and concentration and exhibited loud and rapid speech. (*See, e.g.*, AR 440.)

These fluctuating symptoms are consistent with the nature of mental illness, *see Larson*, 615 F.3d at 751, and by declining to address the content of the treatment notes in her assessment of Dr. Castelinos's opinion, the ALJ failed to draw a logical bridge from the evidence to her conclusion.[5] Indeed, absent a more comprehensive review of the record, it is unclear whether Carzoli's "stable" mental status evaluations mean that he is capable of maintaining a full-time work schedule, as "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *See Scott* v. *Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *see also Campbell*, 627 F.3d at 307 (finding that the ALJ failed to articulate good reasons

---

[5] Although the ALJ referenced the treatment notes when reciting the medical evidence (s*ee* AR 80), she made no mention of them in her discussion of Dr. Castelinos's opinion.

for discounting a treating physician's opinion when the ALJ focused on the treater's mental status examination but ignored other sections of the physician's report pertaining to the claimant's self-reported symptoms).

Moreover, Carzoli's GAF scores of 59 or 60, the vast majority of which were recorded *after* Carzoli's date last insured, are not necessarily inconsistent with Dr. Castelinos's report, because they merely indicate that Carzoli was "barely above the level of being able to work or live independently" at the time the scores were assessed. *Goble* v. *Astrue*, 385 Fed. App'x 588, 594 (7th Cir. 2010); *see also Jones* v. *Colvin*, 1 F. Supp. 3d 874, 877 (N.D. Ind. 2014) ("But moderate symptoms and moderate difficulties are not inconsistent with the inability to hold down a job."); *Granados* v. *Astrue*, No. 09 C 7600, 2011 WL 746285, at *7 (N.D. Ill. Feb. 24, 2011) (noting that GAF scores of 55 mean that the claimant "was just barely at a level suggesting someone could work or live independently," which "doesn't really contradict" the treating physician's opinion that the claimant was unable to work). Certainly Dr. Castelinos found no inconsistency between his opinions and Carzoli's GAF scores, given his acknowledgement in the questionnaire that Carzoli's highest GAF over the past year had been 59.[6] (AR 339); *see Jones*, 1 F. Supp. 3d at 877 ("Dr. Conn apparently believed both that Jones was responding well to treatment *and* that she would be unable to hold a job."). As such, the ALJ was too quick to read inconsistency into these assessments.

On the whole, the ALJ impermissibly ignored evidence from the treatment notes that was favorable to Carzoli's claim. The ALJ's selective discussion of the record prevents this court from conducting meaningful judicial review and therefore falls short of the "good-reasons"

---

[6] The ALJ's emphasis on Carzoli's GAF scores is also unpersuasive given the American Psychiatric Association's decision to drop the GAF scale from the most-recent version of the DSM "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013).

standard.[7] *See Scott*, 647 F.3d at 740 (finding that the ALJ failed to provide good reasons for discounting a treating physician's opinion and explaining that "[t]he ALJ was not permitted to 'cherry-pick' from . . . mixed results" in the record "to support a denial of benefits"); *Indoranto* v. *Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.").

Even if the ALJ had cited sound reasons for refusing to give Dr. Castelinos's assessment controlling weight, the ALJ still had an obligation to determine what value his assessment did merit. 20 C.F.R. § 404.1527(c)(2); *Larson*, 615 F.3d at 751. Specifically, if an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to "consider the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion" to determine the appropriate weight to assign to the treater's assessment. *Larson*, 615 F.3d at 751. Here, many of these factors support Dr. Castelinos's opinion because Dr. Castelinos treated Carzoli on a monthly basis; he is a psychiatrist, not a psychologist; and his opinions find at least some support in Carzoli's treatment notes. *See id.* Nevertheless, there is no indication that the ALJ considered any of the required factors in assigning little weight to Dr. Castelinos's opinion, either explicitly or implicitly. As such, the ALJ's decision is insufficient.

Although the court declines Carzoli's invitation to reverse for an award of benefits, the shortcomings discussed above justify remand. There, the ALJ should reevaluate the weight to be

---

[7] The government argues that Dr. Castelinos's opinion is inconsistent with other evidence in the record such as the assessments of Dr. Larsen, Dr. Travis, and Dr. Biscardi. Because the ALJ failed to rely on this evidence, however, the court may not adopt these *post-hoc* rationalizations to support the ALJ's decision. *See Sec. & Exch. Comm'n* v. *Chenery Corp.*, 318 U.S. 80, 87–88, 63 S. Ct. 454, 87 L. Ed. 626 (1943); *Mendez* v. *Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

afforded to Dr. Castelinos's opinion. If the ALJ finds good reasons for declining to give the opinion controlling weight after conducting a more thorough review of the entire record, particularly Carzoli's treatment notes, the ALJ should determine the weight to which Dr. Castelinos's assessment is entitled.

### IV.     Whether the ALJ Improperly Assessed Carzoli's Credibility

Carzoli also argues that the ALJ improperly assessed his credibility in determining his RFC. Because the court is remanding the case for further proceedings in accordance with this opinion, it will address this argument only briefly.

An "ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones* v. *Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). As such, the court need not undertake a *de novo* review of the medical evidence and must simply "examine whether the ALJ's determination was reasoned and supported." *Elder* v. *Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). Only when the credibility determination "lacks any explanation or support" is the determination found to be patently wrong and deserving of reversal. *See id.*; *see also Powers* v. *Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). With that said, a court has "greater freedom to review the ALJ's decision" when an ALJ's credibility determination rests, as here, "on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor]." *Clifford* v. *Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (alteration in original) (quoting *Herron* v. *Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

In this case, the ALJ gave two primary reasons for finding Carzoli incredible, neither of which is persuasive. First, the ALJ reasoned that Carzoli's testimony about the intensity, persistence, and limiting effects of his impairments was inconsistent with his consistent GAF

15

scores of 60 and his mental status examinations that fell within normal limits. (AR 82.) As discussed above, however, the ALJ focused on Carzoli's GAF scores and mental status evaluations to the exclusion of Carzoli's treatment notes as a whole and thus failed to address medical evidence that supports Carzoli's testimony. While there are instances in the treatment record where Carzoli indicated that he was "having a good day" (AR 278), had "better energy" (AR 284), or felt "less jittery" (AR 290), other treatment notes reference Carzoli's restlessness (AR 289), anxious mood and affect (AR 304), decreased concentration (AR 281, 286), and mood swings (AR 306). Without fully engaging with the content of the treatment notes, the ALJ failed to draw a logical bridge between the evidence and her conclusion. *See Rios* v. *Colvin*, No. 12 C 6470, 2014 WL 4815083, at *7 (N.D. Ill. Sept. 29, 2014) (remanding for a revised credibility finding when the ALJ did not consider medical evidence supporting the claimant's testimony).

Second, the ALJ supported her adverse credibility determination with a perceived inconsistency between Carzoli's testimony that he "does not take care of his personal needs" and a statement from Carzoli's mother indicating that Carzoli bathes every day. (AR 82.) As a preliminary matter, Carzoli did not testify that he does not take care of his personal needs and instead testified that his mother does all of the cooking, cleaning, laundry, and grocery shopping in their condominium. (AR 36.) And while Carzoli testified that "[a] lot of times" he would prefer to lie in bed rather than take a bath (AR 30), Carzoli's testimony cannot be read to mean that he does not take care of his personal needs at all. Thus, the ALJ found an inconsistency where one does not exist.

Even if Carzoli's testimony did reveal an inconsistency, however, it is unclear why his ability to take a bath would cut against a finding of disability. Indeed, given the "critical differences" between activities of daily living and full-time employment, the capacity to bathe on

16

a daily basis does not compel the conclusion that a claimant can hold a job outside of the home. *Bjornson* v. *Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Mendez* v. *Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). As such, the ALJ's reference to Jones's ability to take a bath falls well short of the substantial evidence required to support the ALJ's decision.[8]

Finally, it is worth noting that the ALJ used the following boilerplate paragraph in her decision:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 82.) As the Seventh Circuit has noted with respect to nearly identical templates, this paragraph raises key problems, including "the fact that [it] puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus* v. *Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *see also Bjornson*, 671 F.3d at 645 ("Doubts about credibility were thus critical to [the ALJ's] assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to

---

[8] Moreover, the ALJ's perfunctory reference to Carzoli's obesity, as well as the ALJ's failure to mention Carzoli's testimony regarding his standing limitations and daytime fatigue, call into question whether the ALJ adequately considered the entire record in assessing Carzoli's ability to perform a full-time job. (*See* AR 81 ("[T]here is no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing-level severity.").) On remand, the ALJ must consider Carzoli's medical situation as a whole to determine, for example, whether the interaction between Carzoli's obesity and his other impairments renders him totally disabled. *See Barrett* v. *Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).

credibility, even though it often can't be."). Though the inclusion of this language is harmless when the ALJ has otherwise adequately explained her conclusion, *see Filus*, 694 F.3d at 868, in this case, the ALJ has not. Thus, the ALJ should take note of the flaw on remand.

Overall, the ALJ did not provide sufficient reasons from which the court can discern support for the finding that Carzoli was incredible. Because the ALJ's determination is lacking in evidentiary support, a remand is required.

### CONCLUSION AND ORDER

For the foregoing reasons, the court grants Carzoli's motion for summary judgment (dkt. 12) insofar as it seeks a remand and denies the Commissioner's cross-motion. (Dkt. 20.) The court remands the case to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.


Date:   December 16, 2015                    _____
                                             U.S. District Judge Joan H. Lefkow